Commonwealth *v.* Marshall, Appellant.

Submitted November 8, 1972. Before JONES, C. J., EAGEN, O'BRIEN, ROBERTS, POMEROY and MANDERINO, JJ.

414

*Rudolph S. Pallastrone,* for appellant.

*Maxine J. Stotland* and *Milton M. Stein,* Assistant District Attorneys, *James D. Crawford,* Deputy District Attorney, *Richard A. Sprague,* First Assistant District Attorney, and *Arlen Specter,* District Attorney, for Commonwealth, appellee.

OPINION BY MR. JUSTICE MANDERINO, November 26, 1973:

The appellant on June 29, 1960, pleaded guilty to five counts of robbery, three counts of rape, one count of indecent assault, and one count of aggravated assault and battery. No inquiry was made of the appellant to determine whether the guilty pleas were knowing, intelligent, and voluntary. On July 1, 1960, the appellant was sentenced to a total of thirty to eighty years imprisonment.

Post-trial motions were not filed. In 1968, a petition was filed under the Post Conviction Hearing Act (PCHA), Act of January 25, 1966, P. L. 1580, §§1-14, 19 P.S. §§1180-1 to -14, alleging that the appellant had not been mentally competent at the time he entered his guilty pleas. The PCHA petition was dismissed after a full hearing. The trial court's dismissal was affirmed without opinion in a per curiam order by the Superior Court. *Commonwealth v. Marshall,* 217 Pa. Superior Ct. 836, 270 A. 2d 233 (1970). The petition for allowance of appeal to this Court was then granted.

The trial court stated that one of its reasons for dismissing the PCHA petition was that "the claim that a defendant is not competent to stand trial must be raised at the trial and cannot be the subject of a collateral attack." The trial court cited *Commonwealth ex rel. McNeair v. Banmiller,* 391 Pa. 119, 137 A. 2d 454 (1958), which involved a habeas corpus proceeding and was decided prior to the PCHA. Under the PCHA, however, "[a] plea entered by a defendant without the mental capacity to understand his position is not a knowingly and intelligently entered plea, and is therefore subject to collateral attack." *Commonwealth v. Abel,* 438 Pa. 423, 424, 265 A. 2d 374, 374-75 (1970) ; *see Commonwealth v. Harris,* 431 Pa. 114, 243 A. 2d 408 (1968). Therefore, the question of the appellant's mental capacity to enter the guilty pleas was properly raised in his PCHA petition.

Although the trial court erroneously held that the issue of appellant's mental competency to plead guilty was not properly before the court, it did conclude from the record that the appellant had been mentally competent to plead guilty. We cannot agree with that conclusion because an examination of the record convinces us that the appellant was not mentally competent at the time he entered his pleas of guilty. The test for determining a person's mental competency to enter a guilty plea is: ". . . did he have sufficient ability at the pertinent time to consult with his lawyers with a reasonable degree of rational understanding, and have a rational as well as a factual understanding of the proceedings against him." *Commonwealth v. Harris,* 431 Pa. 114, 117, 243 A. 2d 408, 409 (1968). We conclude on the record before us that the appellant, because of a psychotic condition, was not, under the above test, reasonably able to consult with his lawyer at the time he entered his guilty pleas.

The conclusion of the trial court that the appellant was mentally competent at the time of his guilty pleas was based primarily on two items in the record: (1) The first sentence of a psychiatric report written on November 9, 1959, about eight months before the guilty pleas, which stated "[t]he neuropsychiatric examination reveals no evidence of mental disease or of organic nervous disease." (2) The testimony of the appellant's original trial counsel at the PCHA hearing, from which the trial court concluded "that [the trial counsel] felt confident that defendant knew and understood the nature and consequences of his action, that his answers were responsive and that he did not discern any mental illness which would render defendant incompetent either to stand trial or to enter a guilty plea." Viewed in the context of the total record, however, these two items of evidence do not support the conclusion that appellant was mentally competent at the time of the guilty pleas. A full recital of the facts is necessary.

The appellant at the time of the offenses was nineteen and unmarried. He was the twentieth of twenty-four children and had had an unstable family life. His childhood was spent in Florida during which time he was subjected to abuses by his father. His family moved to Philadelphia. In 1957, he was incarcerated for a conviction in Florida. In 1959, when paroled by the Florida authorities, he joined his family in Pennsylvania. On October 17, 1959, the appellant was arrested for the crimes involved in this appeal and was incarcerated in the Moyamensing Prison from the time of his arrest until his sentencing on July 1, 1960. Shortly after his arrest, the appellant's sister retained counsel for the appellant. During the next nine months counsel conferred with the appellant on several occasions. The cumulative time of these conferences did not exceed one and one-half hours. On November 9, 1959, a court psychiatrist examined the appellant and stated

in a brief one-page report: "The neuropsychiatric examination reveals no evidence of mental disease or of organic nervous disease.  This defendant has *mentally defective* intelligence as indicated by his Wechsler-Bellevue I.Q. of 56 (Verbal I.Q. 72; Performance I.Q. 48). His mental abilities are generally inferior and he is capable of only a marginal adjustment with supervision in the urban community.  He shows no evidence of undue sexuality, but there is little doubt that he would lack discretion in relating to the opposite sex.  He should be returned to a rural environment where his abilities may be less taxed than in a large community. *Diagnosis: Mental defective Recommendation: Discretion of the court.*" (Emphasis added.)  This first sentence of the above report is the one quoted and relied upon by the trial court.  On November 20, 1959, the appellant pleaded *not guilty* to all charges against him. In April of 1960, while awaiting trial in Moyamensing Prison, the appellant, according to the probation department's investigation, in connection with the PCHA hearing, suffered from blackout spells and was "reportedly psychotic."  As to that same period of time, appellant was described in another report later made by the Farview State Hospital staff as suffering a psychotic or nervous breakdown.  After his breakdown, he remained under observation and treatment in the hospital ward of the prison until his trial.  The above reports were submitted in connection with the PCHA hearing. Because of a fire which had occurred at Moyamensing Prison since appellant's incarceration there in 1959 and 1960, original records from that prison were not available.

The indictments indicate that on June 29, 1960, the appellant's pleas were changed from not guilty to guilty. The trial court made no inquiry of him as to whether the change of pleas was intelligent, knowing, and volun-

tary. At the sentencing hearing, original trial counsel made the following statements:

"I do not believe he is quite responsible. I believe he is a sick boy.

. . . .

"He should not be sent to prison. He should be sent to an institution where he should be given treatment.

. . . .

"This is a psychotic case."

Approximately two weeks after his sentencing and admittance to Eastern State Penitentiary, the appellant suffered a complete psychotic breakdown. He required continuous hospitalization and the prison authorities requested a lunacy hearing. In September of 1960, a lunacy commission found him to be insane and recommended that he be committed to Farview State Hospital. He was committed on November 14, 1960, and remained at Farview State Hospital for four years and one month, when he was returned to prison.

In 1968, after the appellant, in his PCHA petition, raised the question of his mental competency at the time of his guilty pleas, the trial court requested that the psychiatric division of the court's probation department investigate and submit a report as to whether the appellant was mentally competent at the time he entered his guilty pleas. In the report submitted, Albert Levitt, a psychologist who examined the appellant, concluded that: "[i]t is felt that [the appellant] had been deteriorating over a period of time prior to his instant offense of 1959 and was probably in a pre-morbid moderate to severe mental condition at the time of the offense. The history reports that after being incarcerated, prior to trial he began having auditory hallucinations and found himself acting in a role of a homosexual. This again is typical behavior of a person who goes into an acute psychotic state. Furthermore, it is just as typical for the state to last for a period of one

to two years. This idea is based on this examiner's own observation of criminals in a penal institution who go through an identical sequence of events, but I am not familiar with any literature that would support this viewpoint. Based on my own experience, however, I would hazard a guess that Clarence was probably not competent at the time of the trial, in that, it is felt that he was probably psychotic at that time." Also in the submitted report, Dr. Fred Hering, a psychiatrist, concluded that "[i]t is very clear that [the appellant] was, in fact, suffering from a mental illness at the time of his trial. On the basis of the history of the nature and severity of this man's psychotic episode, it could be assumed that he was probably not competent at the time of his trial on July 1, 1960." Dr. Hering also sent a letter dated August 9, 1968, to the trial court stating: "Considering the nature of this illness, its duration through his stay at the Eastern State Penitentiary, and for an exacerbated state for several years while at Farview, *it would be my opinion that he was psychotic at the time of his trial or in a severely impoverished and deteriorated mental condition* of a paranoid nature. Therefore *it was more likely that he was incompetent than that he was competent at the time of his trial.* The nature of his paranoid illness would not have impaired his ideation to a point where he would not know the nature of the charges and proceedings. However, *it would severely have impaired him in his ability to be able to cooperate with counsel,* in that he would have been very guarded and suspicious in his relationship towards the lawyer." (Emphasis added.)

Appellant's post-conviction hearing took place on two separate days, January 27, 1970 and March 26, 1970. The psychiatrist, Dr. Hering, testified at the hearing that the appellant was not competent to cooperate with his counsel at the time he entered his guilty pleas. He also testified that the appellant would not

have understood the gravity of the trial in 1960. Dr. Hering testified: "Q. Based on your examination and the reading of the various records and reports on [the appellant] would your diagnosis of schizophrenic paranoia mean that he would understand the gravity of the situation facing him, namely, the trial in 1959? A. Our feeling was that at the time of his trial he would not have been able to understand the nature of this." Dr. Hering further testified that the appellant's I.Q. was somewhere in the 80 to 90 range. Dr. Hering explained that the I.Q. of 56 reported by the psychiatrist on November 9, 1959, resulted because the appellant "was testing out at low levels because of the psychopathology rather than an actual deficiency in his intelligence." When questioned about the determination by the psychiatrist on November 9, 1959, that there was no evidence of mental disease or organic nervous disease evidenced by the appellant, Dr. Hering testified: "Q. He doesn't say psychosis? A. [Dr. Hering] No. Q. Mental defective doesn't rule out psychosis? A. Not at all. Q. In fact, mental defective is generic term which may include psychosis? A. It can, and I am thinking that *the low intelligence report at that time, suggests that he was more mentally ill."* (Emphasis added.)

During the PCHA hearing, counsel, who represented appellant when the guilty pleas were entered in 1960, testified that he felt the appellant was not suffering from any mental incompetency at the time he entered his guilty pleas. This testimony was the second item relied on by the PCHA trial court in denying relief to the appellant. The record reveals, however, that original trial counsel was vague as to the events surrounding the entry of the guilty pleas ten years earlier. He testified that he felt "highly confident" that the appellant understood everything told him—"at least, [the appellant] never said he didn't understand . . . ."

The testimony by original trial counsel was given undue weight by the PCHA trial court. His testimony in 1970 contradicted his remarks ten years earlier. In 1959, original trial counsel described the appellant to the trial court as a "sick boy," not " quite responsible," one who "should be given treatment," "a psychotic case." The sentence in the psychiatric report of November 9, 1959, relied on by the trial court was also given undue weight. In spite of the sentence relied on by the trial court, that report concluded that the appellant was a mental defective and expressed no opinion about the appellant's mental competency to consult with his lawyer. Moreover, that report was made about eight months before the guilty pleas and prior to appellant's breakdown four months before the guilty pleas.

Only one conclusion can be drawn in view of the entire record. The appellant was not mentally competent at the time of his guilty pleas. It cannot be said that the appellant had "sufficient ability at the pertinent time to consult with his lawyers with a reasonable degree of rational understanding, and [had] a rational as well as a factual understanding of the proceedings against him." *Commonwealth v. Harris*, 431 Pa. 114, 117, 243 A. 2d 408, 409 (1968).

Appellant also claims that there existed exculpatory evidence in the record that vitiated the effect of the guilty pleas. The trial court did not consider this issue and it does not require consideration in this appeal.

The order of the Superior Court and the judgment of the trial court are reversed and a new trial is awarded.

Mr. Chief Justice JONES dissents.

Mr. Justice NIX took no part in the consideration or decision of this case.